UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                      :

MOSHE LEFKOWITZ,                 :
                      :

             Plaintiff,  :
                      :

      -v-                :
                      :

WALTER REISSMAN; MARKETWISE  :
TRADING, INC.; BLACKRIVER    :
PETROLEUM, LLC; SADDLE RIVER  :
CAPITAL CORP.; BLACKWOOD CAPITAL :
LIMITED;  DOES 1-10; and CORPORATE :
DOES 1-10,                :
           Defendants.  :
                      :
--------------------------------------------------------X

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/7/2014

No. 12 Civ. 8703 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

      This case arises out of three loans that Plaintiff Moshe Lefkowitz made to companies that were allegedly controlled by Defendant Walter Reissman.  Pursuant to the separate written agreements that governed each transaction, at the expiration of each loan Lefkowitz was to receive his principal plus varying amounts of interest and profit.  He alleges that he was repaid only a fraction of the total funds he loaned and that instead of using the funds for legitimate investment purposes, Defendant Reissman used them to sustain a "Ponzi" scheme.

      Before the Court is Defendants' motion to dismiss the Amended Complaint, which includes a request that several of the claims be submitted to arbitration pursuant to a clause in one of the written agreements.  Also before the Court is Defendants' motion to strike and Plaintiff's motion for sanctions.  For the following reasons, Defendants' motion dismiss is granted in part and denied in part, and the motion to strike and motion for sanctions are denied.

**BACKGROUND**

The Court draws the following facts from Plaintiff's Amended Complaint.  As necessary, the Court also relies on two of the written loan agreements, which Defendants have submitted as exhibits in support of their motion to dismiss.  (Dkt. No. 24.)  Neither party has provided the written agreement for the third loan, although the Amended Complaint alleges that the loan was governed by a written document.  (Am. Compl. ¶ 48.)  The Court relies on these exhibits because they are incorporated in the complaint by reference, (see id. ¶¶ 23, 33), and are integral to its allegations, see, e.g., New York Life Ins. Co. v. United States, 724 F.3d 256, 258 n.1 (2d Cir. 2013).  Plaintiff does not dispute the authenticity of these agreements; indeed, he cites them repeatedly throughout his brief.  (See, e.g., Pl.'s Mem. of Law at 2, 6.)

For simplicity, the Court will refer to the three loans described below as the "Marketwise Loan," the "First Blackriver Loan," and the "Second Blackriver Loan."

The Amended Complaint alleges that Plaintiff made the first loan of $160,000 to Defendant Marketwise Trading, Inc. ("Marketwise") on January 7, 2008.  (Am. Compl. ¶¶ 22-23.)  Plaintiff entered into a written agreement with Marketwise in connection with that loan, executed the same day, which was signed by Defendant Reissman as "Treasurer" of Marketwise.  (Id. ¶ 23.)  Under this agreement, Plaintiff was to recover the full amount of principal, plus 100% of dividends recovered from the loaned funds and 11.85% of profits generated from use of the funds, three years from the date of the agreement.  (Id. ¶¶ 24-25.)  As part of the agreement, the parties agreed to submit any disputes related to the loan to arbitration, (Defs.' Ex. A ¶9(e)), and Plaintiff represented that he was an "accredited investor," had "such knowledge and experience in financial or business matters that [he was] capable of evaluating the merits and risks of the investment in the Stock," and could "bear the economic risks" of the investment, (id. ¶ 6(b)(iv)).

Plaintiff alleges that "[t]o[ ]date, Defendant Marketwise Trading, Inc. has paid $95,235.66 to the Plaintiff, as purported 'profit.'"  (Am. Compl. ¶ 28.)

Plaintiff made the second loan on June 18, 2008, in the amount of $210,000 to Blackriver Petroleum, LLC ("Blackriver").  (Id. ¶ 32.)  On the same date, he executed a "Letter Agreement," which was signed on Blackriver's behalf by its "joint managing members," Defendant Blackwood Capital Limited (by Andrew Taylor Kimmins) and Defendant Saddle River Capital Corporation (by Walter Reissman).  (Id. ¶ 34; Defs.' Ex. B at 4.)  Under the terms of the agreement, Plaintiff was to recover his principal plus 13.5% interest, as well as shares of stock in another company, eighteen months from the date of the loan.  (Am. Compl. ¶¶ 36, 38.)  According to the Amended Complaint, Plaintiff has not recovered any funds in connection with this loan.  (Id.  ¶¶ 41-42.)  Unlike the Marketwise Loan, this agreement (the "First Blackriver Loan") did not contain an arbitration clause.  (See Defs.' Ex. B.)

Plaintiff made his third investment on August 12, 2008, when he wire transferred $100,000 to Blackriver after negotiations with Reissman.  (Am. Compl. ¶¶ 45-46.)  According to the Amended Complaint, Reissman added $36,000 of "profit" from Plaintiff's other loans to this investment.  (Id. ¶ 47.)  This $136,000 was to be used to purchase an oil field in Louisiana; Plaintiff was to be repaid $136,000 plus half of any profits earned through the transaction.  (Id. ¶¶ 49, 53.)  According to the Amended Complaint, Plaintiff has not recovered any funds in connection with this transaction, the "Second Blackriver Loan."  (Id. ¶ 54.)  As discussed above, although the Amended Complaint alleges that a written agreement governed this transaction (id. ¶ 48), neither party has provided that agreement.

Plaintiff commenced this lawsuit on November 30, 2012, and filed an Amended Complaint on April 18, 2013.  (Dkt. Nos. 1, 9.)  Count One asserts a civil RICO claim against

3

Reissman, Blackriver, Marketwise, and Saddle River Capital Corporation ("Saddle River").

Counts Two and Three focus on the Marketwise Loan, asserting claims for breach of contract

and fraudulent inducement against Marketwise.   Count Four centers on the First Blackriver

Loan, asserting a breach of contract claim against Blackriver and Saddle River.   Counts Five and

Six assert breach of contract and fraudulent inducement against Blackriver in connection with

the Second Blackriver Loan.   In Count Seven, Plaintiff alleges fraud against Reissman, asserting

that the entire $506,000 with which Plaintiff entrusted Reissman for investment purposes was

instead used by Reissman for personal gain and to carry out his Ponzi scheme. Count Eight

alleges conversion, and Count Nine unjust enrichment, against Reissman based on the same

conduct.   Count Ten asserts that Reissman used Defendants Marketwise, Blackriver, and Saddle

River as mere instrumentalities, and seeks to pierce the corporate veil of those entities.

## DISCUSSION

The Court first addresses the motion to dismiss and then considers the motions to strike

and for sanctions.

To survive a motion to dismiss, "a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"   Ashcroft v. Iqbal, 556

U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).   "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."   Id.   This standard

"demands more than a sheer possibility that a defendant has acted unlawfully."   Fink v. Time

Warner Cable, 714 F.3d 739, 741 (2d Cir. 2013).   Although the Court accepts as true the factual

allegations in the complaint, it need not do the same for legal conclusions: "[t]hreadbare recitals

of the elements of a cause of action, supported by mere conclusory statements, do not suffice."

Id.

## A.      Count One: Civil RICO

The RICO statute, 18 U.S.C. § 1962(c), provides that it is unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." To establish a claim under this section, "a plaintiff must show that he was injured by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir. 1999).

Plaintiff in this case alleges that Reissman, Marketwise, Blackriver, and Saddle River constitute an "enterprise" for purposes of the RICO statute.  (Am. Compl. ¶ 10.)  He alleges further that Defendants committed five predicate acts, including three instances of wire fraud (by fraudulently inducing Plaintiff to wire funds in connection with each of the three loans); one instance of mail fraud (Defendants used the mails on "numerous dates in 2008" to send documents related to each of the "schemes"); and one instance of money laundering, in that Defendants transmitted money from Israel (where Plaintiff lived) to the United States (where Defendants were located) to further each allegedly fraudulent scheme.  (Id. ¶ 79.)

The Court assumes without deciding that Plaintiff has adequately alleged the existence of an enterprise.  It concludes, however, that virtually all of the instances of mail and wire fraud Plaintiff alleges are nothing more than breach of contract claims, and therefore do not constitute predicate acts.  To the extent any of the alleged predicate acts survive, Plaintiff cannot show that those acts "amount to, or pose a threat of, continuing criminal activity"—another element required to sustain a RICO claim.  GICC Capital Corp. v. Tech. Fin. Grp., Inc., 67 F.3d 463, 465

(2d Cir. 1995).

### 1.    Predicate Acts

To show a "pattern of racketeering activity" as required by the RICO statute, plaintiffs must demonstrate that defendants committed at least two specified predicate acts within ten years of each other.  18 U.S.C. § 1961(5).  The list of predicate activities includes mail fraud, wire fraud, and the money laundering offense Plaintiff alleges.  See id. § 1961(1).  The Court first considers the mail and wire fraud allegations, and then addresses the money laundering claim.

**Mail and Wire Fraud:**  Although RICO's terms are to be "liberally construed to effectuate its remedial purposes," Boyle v. United States, 556 U.S. 938, 944 (2009), this Court has repeatedly cautioned against plaintiffs' attempts "to mold their claims to the RICO form even though their injuries do not fall within those intended to be addressed by the Act," Rosenson v. Mordowitz, No. 11 Civ. 6145(JPO), 2012 WL 3631308, at *5 (S.D.N.Y. Aug. 23, 2012). "Allegations merit particular scrutiny where the predicate acts are mail and wire fraud, and where the use of mail or wires to communicate is not in and of itself illegal, unlike other predicate acts such as murder or extortion." Cohen v. Cohen, No. 09 Civ. 10230(WHP), 2014 WL 279555, at *5 (S.D.N.Y. Jan. 27, 2014) (alteration omitted).  Permitting plaintiffs to advance RICO claims in such cases "would threaten to federalize garden-variety state common law claims, and offer a remedy grossly out of proportion to any public harm or larger societal interests associated with localized wrongful conduct ordinarily involved in such actions." Gross v. Waywell, 628 F. Supp. 2d 475, 483 (S.D.N.Y. 2009).

In addition to cautioning generally about RICO claims premised on mail and wire fraud, the standard for pleading fraud claims is demanding, particularly when a written contract governs the dispute.  At a minimum, a plaintiff pleading RICO predicate acts sounding in fraud must

6

satisfy Fed. R. Civ. P. 9(b), and therefore the complaint must "specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements."  Moore v. PaineWebber, Inc., 189 F.3d 165, 173 (2d Cir. 1999). Additionally, the statement upon which the fraud claim is predicated must be something more than a false promise by a party to a contract that he will fulfill the terms of the agreement.  See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 19-20 (2d Cir. 1996).  A plaintiff asserting fraud based on a counterparty's allegedly false promise to perform must "(i) demonstrate a legal duty separate from the duty to perform under the contract; (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages."  Id. at 20 (citations omitted).

Here, with one exception described below related to the Second Blackriver Loan, Plaintiff's allegations fail to satisfy Rule 9(b)'s particularity requirement because they do not specify a "statement."  Plaintiff's wire fraud allegations assert that Defendants "[f]raudulently induc[ed] the Plaintiff" to wire the various sums of money associated with each loan, and that Defendants did so "with the intent to defraud the Plaintiff out of said funds in furtherance of the Ponzi scheme."  (Am. Compl. ¶ 79(a)-(c).)  Similarly, the Amended Complaint alleges with respect to the mail fraud predicate that Defendants "[u]sed the mail on numerous dates in 2008 to send documents" to Plaintiff "which were used to fraudulently induce the Plaintiff into providing the Defendants with $506,000.00 which was used in furtherance of the Defendants' Ponzi scheme."  (Id. ¶ 79(d)).

Even insofar as these allegations could loosely be said to describe a "statement," that

"statement" would simply be a false promise about future intent to perform a contract.  At best, these allegations allege that Reissman (acting individually or through one of the corporate Defendants) falsely stated that he would use Plaintiff's funds for investment purposes and would repay Plaintiff with principal plus interest at the expiration of the loan.  To maintain a claim for fraud (including mail or wire fraud) in these circumstances, Plaintiff would need to allege (i) that Defendants owed him a separate duty, (ii) that they made a misrepresentation "collateral or extraneous to the contract," or (iii) that he is entitled to special damages not compensable through breach of contract.  Bridgestone, 98 F.3d at 20.  The Amended Complaint fails to make any such allegation.[1]

Plaintiff does not allege that Defendants owed him some legal duty beyond the obligations contained within the contracts.  Nor do the above allegations assert the existence of a statement "collateral or extraneous" to the contract, meaning the misrepresentation of "a present fact" as opposed to a "defendant's future intent to honor that contract."  Blank v. Baronowski, 959 F. Supp. 172, 180 (S.D.N.Y. 1997).  Rather, insofar as the allegations contain any fraudulent statement, that statement is nothing more than a false promise by Reissman that he (or the corporate entities) would repay the loan.  And, although a successful RICO claim would permit Plaintiff to recover treble damages, these are not the "special damages" described in Bridgestone that would permit a fraud claim in these circumstances.  Instead, Plaintiff would need to show some "loss independent of the damages allegedly incurred for breach of contract."

---

[1]       Although Reissman and Saddle River signed the contracts (in representative capacities), one could argue that they were not formally "parties," because the contracts were between Plaintiff and Marketwise and Plaintiff and Blackriver.  (See Defs.' Exs. A and B.)  Courts have not found that difference significant for purposes of this analysis, however, and in analogous circumstances have precluded plaintiffs from bringing fraud claims against a corporation's principal or representative, even though the contract was only between plaintiff and the corporate defendant.  See Bridgestone, 98 F.3d at 14-15, 19; MashreqBank, psc v. ING Grp. N.V., No. 13 Civ. 2318(LGS), 2013 WL 5780824, at *1, *5-*6 (S.D.N.Y. Oct. 25, 2013).  Such a conclusion makes sense.  Were courts to hold otherwise, plaintiffs could sue the corporation (who was a party to the contract) for breach of contract, and then bring a separate suit for fraud against the individual who represented the corporation, thereby bringing duplicative fraud and breach of contract claims.

MashreqBank, psc v. ING Grp. N.V., No. 13 Civ. 2318(LGS), 2013 WL 5780824, at *6 (S.D.N.Y. Oct. 25, 2013); see also Goldfine, 118 F. Supp. 2d at 404-05 (dismissing RICO mail fraud claims that were duplicative of breach of contract claims).  This Plaintiff cannot do.

Construing the Amended Complaint liberally, Plaintiff does allege one potentially fraudulent statement made in connection with the Second Blackriver Loan.  The Amended Complaint asserts that Defendants—it does not explicitly specify who—"claim[ed] that $36,000 of purported 'profits' would be included to total $136,000 as an investment."[2]  (Am. Compl. ¶ 79(c)).  If Reissman or a representative of another Defendant represented to Plaintiff that his past investments had generated $36,000 of "profit," thereby inducing Plaintiff to enter into the Second Blackriver Loan, this statement could constitute a misrepresentation of "a present fact" as opposed to one about a "defendant's future intent to honor that contract."  Blank, 959 F. Supp. at 180.

Even assuming, however, that this statement is adequately pled under Rule 9(b) and that it is not duplicative of the breach of contract claim, this lone fraudulent statement would fail to satisfy an additional requirement for a RICO claim: that Defendants' acts amount to or pose a threat of continuing criminal activity, as described in Section A.2.

**Money Laundering:**  In addition to the predicate acts of wire and mail fraud, Plaintiff also alleged that Defendants engaged in money laundering under 18 U.S.C. § 1956(a)(2)(A).  That statute prohibits the transportation or transmission of money into or outside the United States when done "with the intent to promote the carrying on of specified unlawful activity."  Id.  The phrase "specified unlawful activity," is defined elsewhere in the statute, and generally consists of the RICO predicate acts, including mail fraud, wire fraud, and extortion.  See id.

---

[2]     A separate paragraph in the Amended Complaint appears to allege more precisely that Reissman made this representation: "Plaintiff provided Defendant Walter Reissman with $136,000 ($100,000 plus $36,000—which was purportedly Plaintiff's 'profits' that were included by Defendant Reissman) . . . ."  (Am. Compl. ¶ 136(c).)

§ 1956(c)(7); <u>see also</u> <u>Chevron Corp. v. Donziger</u>, 871 F. Supp. 2d 229, 251 (S.D.N.Y. 2012).

The only "specified unlawful activity" the Amended Complaint describes in connection with this allegation is the "carrying on of the Ponzi scheme." (Am. Compl. ¶ 79(e).) The Court construes this allegation to mean that Defendants transported the money intending to commit mail and wire fraud. Although one could transport money "with the intent to" commit mail or wire fraud without ultimately committing mail or wire fraud, here Plaintiff has not alleged any facts from which the Court may infer that Defendants intended to commit mail or wire fraud, as opposed to simple breach of conduct (an act not included in the definition of "specified unlawful activity," <u>see</u> 18 U.S.C. § 1956(c)(7)).

### 2.     Pattern of Racketeering Activity

The Court therefore concludes that the only potential predicate acts Plaintiff has alleged relate to the statement Defendants' allegedly made in connection with the Second Blackriver Loan, that Plaintiff had earned $36,000 of "profit." Even if this single statement supports separate predicate acts (<u>e.g.</u>, both mail and wire fraud), these acts do not constitute a "pattern of racketeering activity."

Not only must a RICO plaintiff plausibly allege two predicate acts, <u>see</u> 18 U.S.C. § 1961(5), he must also allege that the predicate acts constitute a pattern of racketeering activity, meaning that the acts are "related, and either amount to or pose a threat of continuing criminal activity." <u>Spool v. World Child Int'l Adoption Agency</u>, 520 F.3d 178, 183 (2d Cir. 2008). The latter continuity requirement "can be satisfied either by showing a 'closed-ended' pattern—a series of related predicate acts extending over a substantial period of time—or by demonstrating an 'open-ended' pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." <u>Id.</u>

Nowhere in Plaintiff's brief does he advocate for closed-ended continuity.  Nor could he. Closed-ended continuity requires proof of "a series of related predicates extending over a substantial period of time."  H.J. Inc. v. Northwestern Bell Tel. Co., 429 U.S. 229, 242 (1989). Since the Supreme Court defined the concept of continuity in H.J. Inc., the Second Circuit has "never held a period of less than two years to constitute a 'substantial period of time.'"  Spool, 520 F.3d at 184.  Although the two-year mark is not a bright-line rule, here Plaintiff's allegations—which span approximately nine months (see Am. Compl. ¶ 79)—fall well short of establishing a pattern of acts extending over any "substantial period of time," see, e.g., Spool, 520 F.3d at 185 (concluding that fraudulent statements occurring within a sixteen-month period were insufficient to show closed-ended continuity).

Plaintiff instead concentrates his arguments on open-ended continuity.  To make this showing, he would need to allege "a threat of continuing criminal activity beyond the period during which the predicate acts were performed.  Cofacrèdit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir. 1999).  Courts begin this inquiry by considering the nature of the enterprise and predicate acts alleged.  GICC Capital Corp. v. Tech. Fin. Grp., Inc., 67 F.3d 463, 466 (2d Cir. 1995).  Where the acts are "inherently unlawful"—such as murder or obstruction of justice—and are done in pursuit of "inherently unlawful goals," such as narcotics trafficking or embezzlement, courts presume a threat of continued unlawful activity.  United States v. Aulicino, 44 F.3d 1102, 1111 (2d Cir. 1994).  When the predicate acts are not inherently unlawful, courts look to external factors, such as whether the scheme is inherently terminable, and whether plaintiff has offered any concrete basis for concluding that the predicate acts are likely to continue into the future.  See GICC, 67 F.3d at 466.

None of the predicate acts Plaintiff alleges are "inherently unlawful."  See Skylon Corp.

v. Guilford Mills, Inc., No. 93 Civ. 5581(LAP), 1997 WL 88894 (S.D.N.Y. Mar. 3, 1997) ("Plaintiff alleges, *inter alia*, verbal and written misrepresentations made over the telephone and in letters, constituting wire and mail fraud.  None of these acts are inherently unlawful, but rather are typical of garden-variety fraud claims.").  Moreover, the remaining predicate acts—that is, those fraud claims that are not simply breach of contract claims—relate to a single statement within a single transaction.  The existence of a single scheme also militates against a finding of open-ended continuity.  See, e.g., Pier Connection, Inc. v. Lakhani, 907 F. Supp. 72, 77 (S.D.N.Y. 1995) ("Plaintiffs' claim of open-ended continuity fails because Pier Connection has alleged no facts that would allow the Court to infer that Defendants committed anything other than a single fraudulent scheme.").

Plaintiff asserts that he has demonstrated open-ended continuity by alleging that "upon information and belief" Defendants "have used the same pattern of racketeering activity to fraudulently obtain funds from numerous other individuals in furtherance of the Ponzi scheme"; that they have, "upon information and belief," engaged in "other fraudulent schemes, which continue to this date"; and that if Defendants' activities "remain unchecked," they "may continue" to commit further predicate acts "in the future."  (Am. Compl. ¶¶ 76-78.)  As this Court has concluded, however, a "simple statement that the 'scheme continues to date,' without more, does not suffice" to allege open-ended continuity.  Pier Connection, 907 F. Supp. at 76 (citation omitted).  Here, Plaintiff has failed to identify any other individual who has been affected by Defendants' alleged fraud.  He has not alleged what the other "fraudulent schemes" were, or whether they were perpetrated through Marketwise, Blackriver, or some other entity.  And he has not alleged the time period when any of the other alleged predicate acts occurred, an omission that is particularly significant given that all of the predicate acts alleged in the

Amended Complaint occurred in 2008.  (See Am. Compl. ¶ 79.)  In sum, Plaintiff has failed to offer anything other than threadbare, conclusory allegations that Defendants are likely to commit predicate acts in the future.

The Court therefore concludes that the majority of Plaintiff's predicate acts "amount merely to a breach of contract claim and common business torts, which cannot be transmogrified into a RICO claim by the facile device of charging that the breach[es] w[ere] fraudulent, indeed criminal."  Helios Int'l S.A.R.L. v. Cantamessa USA, Inc., No. 12 Civ. 8205, 2013 WL 3943267, at *9 (S.D.N.Y. July 31, 2013) (alteration omitted).  To the extent that the statement made in connection with the Second Blackriver Loan provides a plausible basis for RICO predicate acts, those acts do not suffice to show a "pattern of racketeering."  Count One is thus dismissed.[3]

## B. Counts Two and Three: Breach of Contract and Fraudulent Inducement Against Marketwise

Counts Two and Three allege breach of contract and fraudulent inducement against Marketwise—not Reissman or any other Defendant—based on the $160,000 loan Plaintiff made to Marketwise.  As described above, the agreement governing this loan contains a clause stating that "any controversy or dispute" that arises between the parties "in connection with, arising from, or in respect to th[e] Agreement," must "be submitted for arbitration to the New York, New York office of the American Arbitration Association in accordance with its commercial rules then in effect."  (Defs.' Ex. A at 5.)

The Federal Arbitration Act, 9 U.S.C. § 1 et seq., "reflects an emphatic federal policy in favor of arbitral dispute resolution," and "requires courts to enforce the bargain of the parties to

---

[3]    As described in the following Section, any disputes related to the Marketwise Loan must be submitted to arbitration.  The question thus arises whether the portion of the RICO claim alleging predicate acts related to the Marketwise Loan must also be stayed in favor of arbitration.  The Court concludes that dismissal of this count, not a stay, is appropriate.  Even if an arbitrator were to conclude that Defendants committed mail or wire fraud in connection with the Marketwise Loan, the Court would still need to decide whether Plaintiff can allege the other requirements of a RICO claim.  For the reasons already described, the Court concludes that Plaintiff cannot allege a plausible RICO claim.

arbitrate." KPMG LLP v. Cocchi, 132 S. Ct. 25 (2011). Here, the Court concludes that it must give effect to the clear text of the parties' agreement.

Plaintiff raises several arguments in response, none of which is availing. The first is procedural: Plaintiff asserts that the Court cannot enforce an arbitration agreement absent a formal motion to compel arbitration, which Defendants have not yet made. Although the Court appreciates that enforcing an arbitration clause *sua sponte* might be inappropriate in certain situations—such as when the issue has not been properly briefed, see Amiron Dev. Corp. v. Sytner, No. 12-CV-3036, 2013 WL 1332725, at *3 (E.D.N.Y. Mar. 29, 2013), or when neither party has explicitly requested arbitration, see Suchodolski Assocs., Inc. v. Cardell Fin. Corp., No. 03 Civ. 4148(WHP), 2006 WL 10886, at *4 (S.D.N.Y. Jan. 3, 2006)—here, Defendants' motion to dismiss properly presents the issue. Both parties have had an opportunity to brief the question and have done so. Additionally, the Second Circuit has explained that in light of the federal policy in favor of arbitration, a party waives its claim to enforce an arbitration clause "only when prejudice to the other party is demonstrated." Rush v. Oppenheimer & Co., 779 F.2d 885, 887 (2d Cir. 1985) (finding that a party had not waived the defense despite eight months of pretrial proceedings, including "extensive" discovery). In light of the demanding standard required to show waiver, nothing would preclude Defendants from filing a formal motion to compel after the adjudication of this motion. Because Defendant has explicitly requested arbitration, and the parties have fully briefed the issue, awaiting the filing of a formal motion would be an inefficient use of the parties' and the Court's time.

Plaintiff next asserts that the arbitration clause is unenforceable because the Amended Complaint alleges that Defendants fraudulently induced Plaintiff to enter into the agreement. The Second Circuit has held, however, that in order to escape the effect of an arbitration clause

based on fraudulent inducement, the party seeking to avoid arbitration must "show that the arbitration clause itself is unenforceable."  Adams v. Suozzi, 433 F.3d 220, 227 (2d Cir. 2005). The party challenging the clause may not "establish a connection between the alleged fraud and the arbitration clause in particular merely by adding the allegation that the arbitration clause was a part of the overall scheme to defraud"; rather, the complaint must include "particularized facts specific to the arbitration clause which indicate how it was used to effect the scheme to defraud." Rubin v. Sona Int'l Corp., 457 F. Supp. 2d 191, 195-95 (S.D.N.Y. 2006).  Here, the "fraud" Plaintiff asserts relates only to Marketwise's intention not to perform the terms of the contract. (Am. Compl. ¶¶ 102-03.)  Plaintiff does not allege any defect with the arbitration clause.

Finally, Plaintiff asserts that the Court should not enforce the arbitration clause because consideration is lacking.  Insofar as Plaintiff asserts that separate consideration was required for the arbitration clause, that argument fails: "if there is consideration for the entire agreement that is sufficient; the consideration supports the arbitration option, as it does every other obligation in the agreement."  Doctor's Assocs., Inc. v. Distajo, 66 F.3d 438, 451 (2d Cir. 1995) (alteration omitted).  To the extent Plaintiff argues that the contract lacked consideration as a whole, that argument is also unpersuasive.  The Amended Complaint acknowledges that Plaintiff transferred $160,000 to Marketwise and that he was to recover that sum plus interest as a result.  (Am. Compl. ¶¶ 99-100; Defs.' Ex. A.)  How Marketwise (or its principal) ultimately used those funds has no bearing on whether the consideration recited in the contract was adequate.

The Court therefore concludes that Counts Two and Three must be submitted to arbitration.  The Second Circuit has held that Courts are empowered to stay all counts in an action where several counts should be submitted to arbitration.  In making this decision, the Circuit has instructed district courts to consider whether "arbitrable claims predominate the

lawsuit and the nonarbitrable claims are of questionable merit." Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 856 (2d Cir. 1987).  Finding neither factor present, the Court stays only Counts Two and Three.

**C.      Count Four: Breach of Contract Against Blackriver and Saddle River**

Count Four alleges breach of contract in connection with the First Blackriver Loan.  That Loan was governed by an agreement between Plaintiff and Blackriver, signed on Blackriver's behalf by its "joint managing members," Blackwood Capital Limited (by Andrew Taylor-Kimmins) and Saddle River (by Reissman).  (Defs.' Ex. B at 4.)

Defendants do not challenge the breach of contract claim as asserted against Blackriver; instead, they seek only to remove Saddle River as a defendant in this claim.  Nowhere does Plaintiff contest this argument.

Defendants are correct: because Saddle River signed the agreement as a member of Blackriver, a limited liability company, Saddle River cannot be held liable—just as an individual who signed a contract on behalf of an LLC could not be held individually liable absent some allegation that he acted outside the scope of his duties or purported to bind himself individually. See, e.g., Panasuk v. Viola Park Realty, LLC, 839 N.Y.S.2d 520, 522 (2d Dep't 2007).  Here, the agreement clearly indicated that Saddle River was signing in its capacity as a member of the LLC, and Plaintiff does not assert otherwise.

**D.      Counts Five and Six: Breach of Contract and Fraudulent Inducement Against Blackriver**

These claims relate to the Second Blackriver Loan.  Defendants do not challenge them.

**E.      Count Seven: Fraud Against Reissman**

To allege a claim of fraud, "a party must state with particularity the circumstances constituting fraud,"  which "requires the plaintiff to (1) specify the statements that the plaintiff

contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Nakahata v. N.Y. Presbyterian Healthcare Sys., Inc., 723 F.3d 192, 197 (2d Cir. 2013).

Plaintiff's fraud claim against Reissman is premised on Reissman's alleged misrepresentation that "the Plaintiff's $506,000 would be used for legitimate investment purposes through Defendant Marketwise and Defendant Blackriver, when in[ ]fact, Defendant Reissman never intended to invest the funds." (Pl's. Mem. of Law at 18.) For the reasons described above, see supra Section A.1, this misstatement—relating to a party's future intent to perform the terms of a contract—cannot support a cause of action for fraud.

The Amended Complaint also alleges that, in connection with the Second Blackriver Loan, Reissman "included" $36,000 that were "purportedly Plaintiff's 'profits.'" (Am. Compl. ¶ 136(c)). This statement—because it is a statement of present fact, not a future promise to perform—could potentially form the basis of a fraud claim. See Blank v. Baronowski, 959 F. Supp. 172, 180 (S.D.N.Y. 1997). Additionally, the Amended Complaint alleges that this statement was made "[o]n or about August 12, 2008," (Am. Compl. ¶ 136(c)), and that it was false: "the purposed $36,000 in 'profits' never existed, but was concocted by Defendant Walter Reissman in order to perpetrate and further a pattern of fraud and racketeering activity" (id. ¶ 56). If the other allegations of the Amended Complaint are true—that Plaintiff recovered only a fraction of the total funds he loaned to Defendants—then Plaintiff's allegation that the $36,000 of profits never existed is at least plausible.

Accordingly, the Court concludes that Plaintiff has plausibly alleged a fraud claim against Reissman, but only with respect to the statement that Plaintiff had earned $36,000 in "profits," made in connection with the Second Blackriver Loan.

**F.      Count Eight: Conversion Against Reissman**

To state a claim for conversion under New York law, Plaintiff must allege "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 204 (S.D.N.Y. 2011). "For a conversion claim to succeed in the context of a dispute regarding a contract," however, "the breach of contract must result in some 'wrong' that is separately actionable." Briarpatch Ltd. L.P. v. Geisler Roberdeau, Inc., 148 F. Supp. 2d 321, 328 (S.D.N.Y. 2001). To determine whether a conversion claim is duplicative of a breach of contract claim, "courts look both to the material facts upon which each claim is based and to the alleged injuries for which damages are sought." Physicians Mut. Ins. Co. v. Greystone Servicing Corp., No. 07 Civ. 10490(NRB), 2009 WL 855648, at *10 (S.D.N.Y. Mar. 25, 2009). A conversion claim "that is based upon the same facts underlying a contract claim will be dismissed as a mere duplication of the contract cause of action." Id.

Here, Plaintiff's conversion claim duplicates his breach of contract claims. His alleged injury for the conversion claim—$506,000 plus interest—is identical to the injuries alleged in his breach of contract claims, $506,000 plus contractually-guaranteed interest and profits. (Am. Compl. ¶¶ 96, 115, 124, 148.) Moreover, the conversion claim arises out of the same transactions as the breach of contract claims. Although Reissman—the Defendant in this claim—was not formally a party to the contracts at issue, that fact does not rescue Plaintiff's claim. This Court rejected a similar argument in Gate Technologies, LLC v. Delphix Capital Markets, LLC, No. 12 Civ. 7075(JPO), 2013 WL 3455484, at *5 (S.D.N.Y. Jul. 9, 2013),

concluding that the operative question was whether "the remedy for the proposed [conversion] claims would merely duplicate that already sought" in the breach of contract claims. Because Plaintiff's injury from Reissman's alleged conversion merely duplicates his injury from the alleged breaches of contracts, his conversion claim is dismissed.

## G.      Count Nine: Unjust Enrichment Against Reissman

To prevail on an unjust enrichment claim under New York law, plaintiff must establish: "(1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff." Golden Pac. Bancorp v. F.D.I.C., 273 F.3d 509, 519 (2d Cir. 2001).

"Unjust enrichment is a quasi-contractual claim that ordinarily can be maintained only in the absence of a valid, enforceable contract." Ellington, 837 F. Supp. 2d 162, 202 (S.D.N.Y. 2011). Recognizing that Fed. R. Civ. P. 8(d) permits parties to plead in the alternative, however, this Court has permitted plaintiffs to raise simultaneous claims for breach of contract and unjust enrichment when either party has raised a question about whether the contract governing the dispute was valid and enforceable. For instance, the Court in Ox v. Union Cent. Life Ins. Co., No. 94 Civ. 4754(RWS), 1995 WL 634991, at *5-*6 (S.D.N.Y. Oct. 27, 1995), permitted plaintiff to plead an unjust enrichment claim despite the existence of an express agreement that governed the dispute, because plaintiff also alleged a fraudulent inducement claim. The Court explained that "as long as a factual issue remains as to the fraud claim, recovery under a theory of unjust enrichment may be proper, even in the presence of an alternative breach of contract claim." Id. at *6. Judge Oetken in Gate Technologies also allowed simultaneous breach of contract and unjust enrichment claims, even though (1) defendant did not challenge the breach of

contract claim and (2) plaintiff's conversion claim was found to be duplicative of the breach of contract claim.  See 2013 WL 3455484, at *6.

Here, although express agreements governed the transactions through which Reissman allegedly unjustly enriched himself, Plaintiff has alleged that at least one of the agreements—that governing the Second Blackriver Loan—was fraudulently induced.  (Am. Compl. ¶¶ 125-33.) Defendants have not challenged that fraudulent inducement claim in this motion.  Because—at least at this time—"a factual issue" remains as to the fraudulent inducement claim, the contract governing the Second Blackriver Loan is potentially voidable.  Ox, 1995 WL 634991, at *6. Plaintiff may therefore plead an unjust enrichment claim, "although solely as an alternative to the breach of contract claim."  Bridgeway Corp. v. Citibank, N.A., 132 F. Supp. 2d 297, 305 (S.D.N.Y. 2001).

## H.     Count Ten: Piercing the Corporate Veil

Finally, Plaintiff seeks to pierce the corporate veil of Marketwise, Blackriver, and Saddle River so as to make Reissman liable for any judgment entered against the corporate Defendants. Because any claims against Marketwise are subject to arbitration, and Saddle River was dismissed as a Defendant in the only claim asserted against it (Count Four), the Court considers only whether to pierce Blackriver's corporate veil.

Under New York law, a plaintiff seeking to pierce the corporate veil must establish that "(1) the owner has exercised such control that the corporation has become a mere instrumentality of the owner, which is the real actor; (2) such control has been used to commit a fraud or other wrong; and (3) the fraud or wrong results in an unjust loss or injury to plaintiff."  Freeman v. Complex Computing Co., 119 F.3d 1044, 1052 (2d Cir. 1997) (alterations omitted).  In assessing whether plaintiff has shown that the corporation is a "mere instrumentality" of the owner, courts

consider whether the corporation observed "the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like"; whether the corporation was adequately capitalized; whether funds were deposited and withdrawn for personal purposes; and whether the corporation and individual shared office space and telephone numbers.  Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 139 (2d Cir. 1991).

Here, the Amended Complaint alleges, "upon information and belief," that Reissman is the "owner" of each of the three corporate entities; that he "exercised complete domination and control" of them and "controlled any and all transactions involving and/or related to said Defendants"; and that his "domination and control" of the entities "was used to commit a fraud against the Plaintiff."  (Am. Compl. ¶¶ 156-58).

Although the "mere claim that the corporation was dominated by the defendants[,] without more, will not suffice to support the equitable relief of piercing the corporate veil," Ningbo Prods. Import & Export Co. v. Eliau, No. 11 Civ. 650(PKC), 2011 WL 5142756, at *6 (S.D.N.Y. Oct. 31, 2011), here there is something "more."  Namely, the Amended Complaint alleges that Blackriver and Saddle River shared an address—400 Rella Boulevard, Suite 174, Suffern, New York—and all correspondence to Marketwise in connection with the Marketwise Loan was to be sent to the 400 Rella Boulevard address, "Attention Walter Reissman."  (Am. Compl. ¶¶ 13-14; Defs.' Ex. A at 5.)  Moreover, the Amended Complaint alleges that with respect to both Blackriver Loans, Plaintiff negotiated with Reissman and Reissman signed the agreements on Blackriver's behalf.  (Id. ¶¶ 33-34, 47-48.)  Viewed in the light most favorable to Plaintiff, these allegations assert that Reissman held a controlling interest in Blackriver; that he negotiated and signed contracts on its behalf; and that he did so from the same office suite used

21

to conduct the business of two other corporations in which he also held a controlling interest and on whose behalf he also negotiated and signed contracts. These allegations raise at least a plausible claim that Reissman used Blackriver as a mere instrumentality.

Further, Plaintiff has plausibly alleged that Reissman used his control of Blackriver to commit a "fraud or other wrong" that caused Reissman injury. As this Court has already explained with respect to Count Seven, see supra Section E, Plaintiff has plausibly alleged that Reissman made a fraudulent misstatement with respect to the Second Blackriver Loan, by representing that Plaintiff's earlier investments had earned a "profit" of $36,000.

## I.    Additional Motions

Defendants filed a motion to strike certain statements and footnotes in Plaintiff's memorandum of law opposing the motion to dismiss. (Dkt. No. 33.) Asserting that the motion to strike was "without merit in law or fact," (Dkt. No. 38 at 2), Plaintiff moved for sanctions. (Dkt. No 37.)

Both motions are denied. Although Defendants were incorrect with respect to several assertions in their motion—as evidenced in part by their decision, in their reply memorandum, to withdraw their request to strike at least one statement (Dkt. No. 36 at 6)—Plaintiff did include several assertions in his opposition memorandum that went beyond the allegations of the Amended Complaint and whose relevance to the motion to dismiss were less than clear, (see, e.g., Pl's. Mem. of Law at 2 n.1 (asserting that Reissman refused to provide Plaintiff with access to corporate records and that Defendants' counsel withdrew from the action because Defendants allegedly also refused to provide him with access to documents)). Accordingly, Rule 11 sanctions are not warranted at this time.

## CONCLUSION

Defendants' motion to dismiss is granted in part and denied in part.  Defendants' motion

to strike is denied, as is Plaintiff's motion for sanctions.  To summarize:

- Count One is dismissed;

- Counts Two and Three are stayed pending arbitration;

- Count Four survives against Blackriver, although Saddle River is dismissed as a
  Defendant;

- Counts Five and Six survive, as Defendants have not challenged these counts;

- Count Seven survives, but only with respect to the statement that Plaintiff had earned
  $36,000 in profits;

- Count Eight is dismissed; and

- Counts Nine and Ten survive.

The Clerk of Court is respectfully requested to close the motions pending at docket

numbers 23, 33, and 37, and to remove Saddle River Capital Corp., Blackwood Capital Limited,

Does 1-10 and Corporate Does 1-10 as Defendants from the docket.

The July 9, 2013 Order of Reference for general pretrial remains in effect, and the parties

shall continue to conduct discovery under the supervision of Magistrate Judge Freeman.  Within

ten days of the close of discovery, the parties shall submit a joint status letter to the Court.

SO ORDERED.

Dated:        March 7, 2014
              New York, New York

                                          Ronnie Abrams
                                          United States District Judge

23